IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>vs.<br><br>ALLEN E. PEITHMAN, JR., and<br>AEP PROPERTIES, L.L.C.,<br><br>              Defendants. | 4:15CR3091<br><br>**MEMORANDUM AND ORDER** |

      Defendant Allen E. Peithman, Jr. has filed a motion under 28 U.S.C. § 2255. As required by Rule 4(b) of the Federal Rules Governing Section 2255 Proceedings, I have conducted an initial review of the newly filed Motion to Vacate under § 2255. I herewith deny it because the motion, files and records establish that the defendant is not entitled to relief.

*Background*

      In *United States v. Peithman*, 917 F.3d 635 (8th Cir.), *cert. denied*, 140 S. Ct. 340 (2019), the history, both legally and factually, of this unusual and complex case is set forth in detail.

      In late 2013, law-enforcement officers, acting in an undercover capacity, began buying products suspected of containing synthetic marijuana from smoke shops. Dirt Cheap and Island Smokes were two of the targeted shops where undercover buys occurred in 2014 and 2015. Allen Peithman first began operating Dirt Cheap in 2008. Dirt Cheap sold cigarettes, glass pipes, water pipes, t-shirts, and e-cigarette products—"typical head shop stuff." When the store first opened, Peithman sold "K2," which is now referred to as "potpourri." Peithman explained to law enforcement that "K2" did not contain any banned chemicals, did not cause

consumers any problems[1] and was in high demand because it did not show up on drug tests. According to Peithman, "every shop in town" began selling "K2" because the product had a very high profit margin.

Peithman's operation of Dirt Cheap was interrupted when he was incarcerated on a federal firearm charge between March 2013 and June 2014. When Peithman was operating Dirt Cheap, he primarily relied on his wholesale suppliers to review the list of prohibited controlled substances and to insure that the "potpourri" complied with state and federal controlled-substances laws. He informed law enforcement that the vendors constantly changed the products they sold to keep ahead of the evolving law. The "potpourri" sold at Dirt Cheap and Island Smokes was purchased primarily on the Internet with money orders. According to Peithman, the profit margins plummeted for "potpourri" sold during the last few years of his business. Nonetheless, on a "good day" Dirt Cheap made around five thousand dollars. On a "bad day" it would be a couple thousand dollars.

During Peithman's incarceration, Dirt Cheap was operated by Sharon A. Elder, his mother, although Peithman retained ownership of the name Dirt Cheap. In September 2014, Elder opened her own store, Island Smokes, because Peithman did not want to sell "potpourri" at Dirt Cheap any longer. Peithman purchased the property for the new store from his uncle and leased it to his mother. After Island Smokes opened for business, Dirt Cheap ceased selling "potpourri," but continued to sell what law enforcement considers drug paraphernalia, as well as other items typically sold in smoke shops. Island Smokes sold drug paraphernalia, "potpourri" and other items typically sold in smoke shops.

---

[1] As it turned out, a lot of people (perhaps a 100 or so) were hospitalized because of the use of this drug. Of course, the precise number of people who were sickened cannot be attributed to a specific person or entity because other head shops were selling the drugs too. Whoever sold it, the drugs were extremely dangerous, as several consumer-witnesses testified at trial.

Between February 2014 and August 2015, law-enforcement officers conducted at least nine undercover buys. Several of the packets purchased were sent to a lab and tested positive under the United States Drug Enforcement Administration ("DEA") drug scheduling as a Schedule I controlled substance. In addition, in April 2014, law enforcement obtained a search warrant for five boxes scheduled to be delivered to Dirt Cheap based on information from a Federal Express driver that he had become ill due to an odor coming from packages. The boxes contained approximately 2,500 various fruit-flavored packets of "K2/potpourri" in three-gram and ten-gram amounts. At that time, the packets tested negative for DEA Schedule I controlled substances.

By September of 2014, the Lincoln Police Department was receiving an average of 20 to 30 calls per week about people hanging around Island Smokes and trespassing at an adjacent apartment complex. Over a four-day period in April 2015, law-enforcement officers responded to at least seven medical emergencies involving "potpourri" bought at Island Smokes and smoked by the purchaser. Law enforcement encountered some of the overdose victims near Island Smokes and visited others at the hospital.

On April 23, 2015, law-enforcement officers executed a search warrant at Island Smokes. One of the investigators noticed 100 pipes in a storage area behind the front counter, which in his experience were commonly used to smoke methamphetamine. When questioned, Elder called them "oil burners." When asked if Elder had aromatic oil to burn in the pipes, she located two small vials from behind the checkout counter. Elder reported to law enforcement that she generally kept 10 vials of oil per 100 pipes.

Officers seized a "K2" packet and pipe discovered while searching the back of the garage area, which upset Elder because she believed all the "K2/potpourri" had been removed from the store. Elder told investigators during the search of her store that even though the "potpourri" packets were labeled "do not burn," she knew a majority of her customers smoked "potpourri," purportedly to relax. She also

3

informed the investigators that her customers had requested a milder blend because her current and recent stock was too strong, and they did not like the effects.

In total, officers seized from Island Smokes more than 1,000 assorted glass pipes, bongs, gas mask pipes, dugouts and one-hitter pipes in different colors, sizes and styles. Cigar wrappers and rolling papers were also seized. A total of 560 packets of "potpourri" were seized. Twelve sample "potpourri" packets from the inventory were sent to a lab for testing. Four of the 12 sample "potpourri" packets contained DEA Schedule I controlled substances. In addition, Food and Drug Administration ("FDA") Special Agent Bradley Cooper opined at trial that the seized "potpourri" packets were misbranded because they did not comply with FDA labeling requirements. He testified the packets were missing instructions for proper use, adequate warnings of potential adverse side effects, a list of active ingredients, a description of the contents and the manufacturer's name.

On August 25, 2015, law-enforcement officers executed a search warrant at Dirt Cheap. Glass pipes, bongs, hookahs, water pipes, scales, grinders, dugouts, one-hitters, plastic baggies, rolling papers, screens, other types of drug paraphernalia and business records were seized. Law-enforcement officers also obtained bank records for Peithman and Elder and their business accounts. An operations officer for West Gate Bank testified during the trial that multiple cash deposits in Peithman's Dirt Cheap business account would be made on a single day. For example, on December 19, 2013, a $5,000 cash deposit was made at 10:12 a.m. using teller #54; a second $4,000 cash deposit was made to the same account at 2:20 p.m. at the same branch using teller #56; and a third cash deposit of $1,292 was made 18 minutes later to the same account at the same branch using teller #58.

Between October 1, 2013, and May 11, 2015, a total of $1,100,957.65 in cash was deposited into bank accounts belonging to Peithman, Elder, Cornerstone Plaza and AEP Properties. An expert in the field of financial investigations testified at trial about transactions indicative of structuring. He opined that the "even-dollar" cash deposits made to the various accounts belonging to businesses were indicative of an

intent to structure because they are inconsistent with normal business activity. He further opined that two cash deposits made on consecutive days in an amount slightly under the $10,000 threshold daily limit might also indicate an intent to structure. Similarly, multiple deposits on the same day—and sometimes less than 20 minutes apart as occurred here—that totaled more than $10,000 for the day, but individually were under the $10,000 limit was indicative of structuring. The expert also testified that structuring could occur through multiple cash deposits on the same day at different banks in amounts less than $10,000 to avoid depositing more than $10,000 into any one account on a single day. According to the expert, the bank records presented at trial contained deposits indicative of structuring.

After her arrest for charges related to this case, Elder stressed to law enforcement that she, not her son, was solely responsible for the sale of "potpourri" during and after Peithman's incarceration. Both Elder and Peithman asserted at trial that Elder "went to great lengths" and used "due diligence" to make sure the products she was selling were legal. They cited as examples Elder's efforts to review the chemical sheets associated with the products, her discussions with the suppliers, her attendance at conferences, her consultation with a lawyer and her decision to keep in contact with law enforcement and follow their advice, such as when she was asked to stop selling a particular product because of the serious side effects people were experiencing.

After a long and very well fought jury trial, the jury convicted Peithman, Elder and AEP Properties on some counts and acquitted on others. The jury found Peithman and Elder guilty of conspiracy to distribute drug paraphernalia, conspiracy to commit mail fraud, investment of illicit drug profits, conspiracy to distribute misbranded drugs and conspiracy to structure financial transactions.

Peithman was sentenced to a period of incarceration of 115 months and Elder to a term of 63 months. The lengthier sentence for Peithman was due primarily to his criminal history and his conduct during the offense, such as admittedly lying to

the pretrial services officer.[2] Both sentences were at the high end of the applicable advisory Sentencing Guidelines range as calculated.

The government sought forfeiture of specific property owned by Peithman, Elder and their companies. Both parties agreed to submit the issue of which property should be forfeited to the jury. The jury agreed that the packets of "potpourri" and related drug paraphernalia together with one bank account were subject to forfeiture. The jury was unable to reach a unanimous agreement on other specific items and found other items should not be forfeited. The items the jury did not forfeit or could not agree should be forfeited were the most valuable items of specific property.

The government also sought a money judgment as part of the forfeiture allegations pertaining to the drug paraphernalia conviction, the mail fraud conviction and the structuring conviction. That issue was decided by me as the law allowed. The government requested a money judgment in the amount of $2,248,728.56. After conducting a hearing on the issue, I found, by a preponderance of the evidence, the appropriate money judgment was in the amount of $1,142,942.32, which "represent[ed] the wholesale costs of acquiring the drug paraphernalia and potpourri, the sale of which generated the structuring." I specifically rejected the "proceeds theory" and was cautious to take steps to ensure double counting did not occur.

Except for requiring me to make a specific allocation of liability as to the sum of $117,653.57 forfeited under a particular statute, and not based on a joint-and-several liability theory, the appeal as to all Defendants was unsuccessful. On remand, I split the difference and found Peithman and Elder each responsible for $58,826.78. (Filing 506.) But both remained remain equally culpable and jointly and severally

---

[2] Peithman did not testify at the merits trial, but did testify at the forfeiture trial that was held after the merits trial. During the forfeiture portion of the trial, Peithman admitted he failed to report all assets to his pretrial services officer in an attempt to keep the assets from being taken.

6

liable (pursuant to a different statute) for the money judgment of $1,025,288.75. No appeal was taken.

This § 2255 motion was timely filed.

*Claims*

> CLAIM ONE: Ineffective Assistance of Counsel—Failure to Properly Advise the Defendant of the Risks and Benefits of his Testifying at Trial. My trial counsel never properly advised me, or made a reasonable assessment of, the risks and benefits of my testifying in my own defense. There were facts known only to me, or that were not otherwise established by independent evidence including: 1) The reason I had two bank accounts; a fact that was argued by the prosecution to support its claim of improper structuring of transactions or investment of illicit profits. When I testified in the forfeiture phase of the trial I explained the exculpatory reason for the two bank accounts, which explanation if offered at my trial would have taken an important factual argument from the prosecution; 2) That I made improvements to my house which I paid by check, which would have rebutted arguments of the prosecution that I only made large payment[s] with cash; 3) The reason I made several bank deposits of business receipts throughout the day was to avoid the risk of robbery or theft and not to avoid bank reporting requirements as argued by the prosecution; 4) Testifying as to public media accounts that I heard of our business activities, that repeated my understanding at the time that the sale of K2 was legal, as relevant to my intent and/or state of mind. When I did testify at the forfeiture phase of the trial as to such matters, the jury credited my testimony in refusing to forfeit a substantial amount of my assets. My trial counsel simply advised I should not testify, because the "case was won" and if I testified it would put Sharon Elder's defense in jeopardy, which analysis was unreasonable and prejudicial under Strickland.

7

> CLAIM TWO: Ineffective Assistance of Counsel—Failure to Fully and Fairly Advise the Defendant as to the Risks and Benefits of Accepting the Government[']s Plea Offer. Prior to the trial, the government proposed a plea agreement that the Defendants would plead guilty to several counts of the Indictment with a sentence of probation for Sharon Elder, and a sentence of four years for me with credit for two years already served, with the government forfeiting all of the defendants['] assets. I believed I had a defense to the criminal charges and a separate defense to the forfeiture allegations as I had a separate source of funds or inheritances that would show my assets were not acquired with illicit profits as I testified to at the forfeiture phase of my trial. I believed that even if convicted of the charges in the Indictment, I could successfully contest the forfeiture, so a plea offer that required the forfeiture of my assets was not agreeable. I was never informed that even if I were successful in defense of the forfeiture action, that the government could obtain a money judgment against me that could be used to seize the same assets that the jury refused to forfeit. Had I known that I could successfully defend the forfeiture action, but still lose all of those same assets under a money judgment if I were convicted, I would have accepted the plea agreement and agreed to surrender my assets. I was prejudiced in that the sentence imposed was far greater than the sentence proposed in the plea agreement, and I still lost all of my assets based upon government seizure to satisfy the money judgment.

(Filing 544 at CM/ECF pp. 4-5.)

### *Ineffective Assistance of Counsel Standard*

The test for ineffective assistance of counsel is well-known. It requires proof of two prongs. *Strickland v. Washington*, 466 U.S. 668, 694 (1984) (announcing principles for evaluation of claims of ineffective assistance of counsel under the

Sixth Amendment). In order to prevail on a claim that defense counsel rendered ineffective assistance of counsel under *Strickland* such that relief is warranted, the claimant must establish two things. He or she must establish (1) that "'counsel's representation fell below an objective standard of reasonableness,'" and (2) that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Nguyen v. United States*, 114 F.3d 699, 703-04 (8th Cir. 1997) (quoting *Strickland*, 466 U.S. at 688-89).

Regarding the first prong, a judge's "scrutiny of counsel's performance must be highly deferential," and the judge must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Reed v. United States*, 106 F.3d 231, 236 (8th Cir. 1997). In other words, a judge should make "every effort" to "eliminate the distorting effects of hindsight" by examining the lawyer's performance from "counsel's perspective at the time" of the alleged error. *Strickland*, 466 U.S. at 689.

Regarding the second prong, a "reasonable probability" is less than "more likely than not." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (citing *Nix v. Whiteside*, 475 U.S. 157, 175 (1986) ("[A] defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under *Strickland*")). But the showing must be compelling enough to "undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Analysis of Claim One*

In Claim One, Peithman faults his counsel for suggesting that he not testify during the trial on the merits. This claim borders on the ridiculous.

Reminding Peithman that his testimony might hurt his mother, who was his codefendant, is not malpractice where, as here, any fair reading of the record shows that both Peithman and Elder intentionally presented a joint defense that was consistent. In harming his mother, he could, due to conspiracy principles, also harm

9

himself. By keeping Peithman off the stand during the merits trial, Peithman's counsel also kept the government from probing his knowledge of drugs. The jury was not aware of the nature of the prior convictions or that he was involved in drugs shortly before the instant offenses.[3] (He had been found guilty in state court of gun possession by an addict shortly before these events took place. (Filing 423 CM/ECF p. 41 ¶ 98).) Still further, had he testified at trial, he would have had to admit he lied to the pretrial services officer in this case in order to hide assets, as he admitted during the forfeiture proceedings. What is more, at the end of the merits trial, counsel for Peithman advised me that he had consulted with Peithman about not testifying. Mr. Peithman told me that he had decided not to testify. (Filing 387 CM/ECF p. 1-3.) Simply put, Peithman's counsel was effective and not ineffective.[4] In fact, he did a terrific job.

*Analysis of Claim Two*

The second claim has as its essence that Peithman did not know that the rejection of the plea agreement could cost him a lot of money through the forfeiture allegations. This claim is nonsense.

Peithman was no naïf. At 38 years of age (filing 423 at CM/ECF p. 3), he was two courses short of having BA degree in English. (*Id.* CM/ECF p. 45 ¶ 120.) He also had a criminal history category of IV. He had two drug convictions. (*Id.* at CM/ECF pp. 40-41 ¶¶ 97-98.)

---

[3] *See*, *e.g.*, *United States v. Thomas*, 398 F.3d 1058 (8th Cir. 2005).

[4] Peithman has also shown no prejudice. Given the fact that there was a split verdict—conviction on some, but not all, counts—I fail to see how prejudice could be shown under the best of circumstances and the Defendant gives me no reason to believe otherwise.

10

A *Frye*[5] hearing was held in which the proposed plea agreements were produced and discussed in detail with Magistrate Zwart to determine that Peithman's rejection of the plea agreements (one for himself personally and one for the corporation he owned solely) were knowing, intelligent and voluntary. (Filing 215 (hearing); filing 546 (Peithman plea agreement); filing 547 (AEP plea agreement).) Both plea agreements stipulated that Peithman and his corporation were subject to forfeiture of both real and personal property. In particular, the plea agreement regarding Peithman specifically stated that he was subject to a money judgment of up to $262,516.00. (Filing 546 at CM/ECF pp. 6-7 ¶ (V)A.)

In short, any claims that his counsel was not effective or that he was prejudiced regarding counsel's advice regarding the plea agreements are, to put it bluntly, hogwash. He knew exactly the risk he was undertaking and did so in a knowing, intelligent and voluntary fashion.

*No Certificate of Appealability*

Finally, a defendant cannot appeal an adverse ruling on a § 2255 motion unless he or she is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b)(1). The standards for certificates (1) where the district court reaches the merits or (2) where the district court rules on procedural grounds are set forth in *Slack v. McDaniel*, 529 U.S. 473, 484-485 (2000). I have applied the appropriate standard and determined that the Defendant is not entitled to a certificate of appealability.

After careful consideration,

IT IS ORDERED that the § 2255 motion (filing 544) is denied with prejudice.

Dated this 20th day of November, 2020.

---

[5] *Missouri v. Frye*, 566 U.S. 134 (2012).

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge